**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN MCCALLIE, individually and on behalf of all others similarly situated,<br><br>                       Plaintiff<br><br>   v.<br><br>DRAFTKINGS, INC. and FANDUEL INC.,<br><br>               Defendants. | Case No. 1:15-cv-8463<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John McCallie, individually and on behalf of a proposed class described below, brings this action for injunctive relief and monetary damages against Defendants DraftKings, Inc. and FanDuel, Inc.

## I.     SUMMARY OF THE CASE

1.     Plaintiff and Class members are individual purchasers of entry slots in daily fantasy sports ("DFS") contests sold by Defendants, DraftKings and FanDuel—the two largest companies in the multi-billion dollar DFS industry.  The DFS industry grew out of traditional fantasy sports games, which were created in the 1960s and track the performance of individual athletes.  In traditional fantasy sports, participants create teams by selecting athletes to their roster of players, and manage those teams throughout the season.  Athletes' real world on-field performance translates into fantasy points, and generally, at the end of the season, the fantasy team whose athletes have scored the most fantasy points has a chance to win.  Over the course of the season, fantasy competitors function as general managers, and have ample opportunity to use their skill and knowledge to win by, for example, selecting or releasing athletes and completing trades with other fantasy players based on perceived player value.

2.      Established in the mid to late 2000s, DFS contests have rapidly increased in popularity and profitability over the last five years and are more akin to a casino sportsbook than traditional fantasy sports.  Unlike traditional fantasy sports, DFS contests only track player performance on a single day and therefore, entrants have limited opportunities to use their skill and knowledge to impact their chances of winning.  Likewise, entrants do not have the ability to complete trades or add undrafted players to their teams. Because each DFS "season" takes place on one day, players can pay their entry fees and win or lose their money over a short period of time.

3.      DraftKings and FanDuel have spent millions in advertising to convince consumers that their contests are games of skill where entrants compete for cash prizes on a level playing field.  For example, from July to September 2015, Defendants reportedly spent a combined $150 million in advertising.  According to the New York Times, in one three-week stretch before the NFL season, DFS commercials appeared every 90 seconds on national networks.  These advertisements emphasize that anyone can win large sums of money using their knowledge of DFS rules and player information.  One recent DraftKings advertisement touts "the giant check is no myth, no mirage, no fool's gold. It's our trophy, and many hoist it playing our one week games."  Similarly, FanDuel's testimonial format advertisements feature "regular guys" who hit it big, emphasizing that normal contestants can fairly leverage their skill and knowledge to win.

4.      Because Defendants have falsely positioned their contests as games of skill, they have avoided regulations applicable to gambling and similar businesses.  As a result, the DFS industry is largely unsupervised and Defendants have failed to establish basic internal controls designed to create what they advertise to consumers—a fair contest.   For example, until

recently, Defendants did not prohibit DFS employees with aggregated nonpublic information from participating in rival DFS sites, even though this information gives employees a distinct advantage over the average participant.  This was first made public after a DraftKings employee inadvertently revealed his access to this information on September 27, 2015, and won $350,000 in a FanDuel contest that same weekend. The same employee also won major cash prizes 20 out of 31 days in August 2015.

5.      Shortly after news of the DraftKings employee winning FanDuel DFS contests broke, more reports of Defendants' employees entering and winning DFS contests surfaced. FanDuel now admits that its employees have won up to $10 million in DraftKings contests. Likewise, until recently, Defendants did not bar participation from sports insiders including athletes, team doctors, team trainers, spouses, or family members who possess inside information on athletes' injuries, disciplinary issues, or participation in a given week.  Prior to October 16, 2015, when Defendants updated their Terms of Use,[1] DraftKings and FanDuel did not prohibit such insiders or even referees or officials from participating in their contests. Referees and officials can directly impact an athlete's real-world performance, which further diminishes the average consumers' prospects of winning a DFS contest.

6.      After reports of DFS employees misusing inside information surfaced, state and federal regulators announced investigations, including the Federal Bureau of Investigation, the Department of Justice, and the New York Attorney General. On October 16, 2015, the Nevada Attorney General issued a 17 page memorandum concluding that DFS constitute gambling and Nevada halted all DFS activity pending proper licensure.  These conclusions were based largely on statements by Defendants, including DraftKings's owner, co-founder, and CEO, who stated

---

[1] FanDuel and DraftKings updated their Terms of Use on October 16 and 19, 2015 respectively.

that DFS was "almost identical to a casino."  Regulators in California, Georgia, Illinois, Michigan, Pennsylvania, and Ohio have similarly questioned the legality of DFS.

7.      Defendants fail to disclose to consumers that DFS is unregulated gambling, and that their contests are tilted to favor insiders like employees.  Average contestants like Plaintiff and Class members do not have an equal opportunity to use their skill and knowledge to prevail in DFS contests, and in fact, a small minority of users takes home the vast majority of winnings. According to McKinsey & Company's Global Sports and Gaming Practice, just 1.3 percent of all DFS players won 91 percent of player profits in the first half of the fantasy baseball season. DFS insiders refer to this dynamic as a "shark and fish," or "shark and minnow" system, where the few winners are "sharks" and average consumers are "fish."

8.      Plaintiff and Class members were at a competitive disadvantage in Defendants' DFS contests because they did not have access to the proprietary statistical tools and inside information that Defendants' employees and others enjoyed.  Had Plaintiff and Class members been aware that Defendants allowed their employees and other persons possessing competitively advantageous inside information to compete in DFS contests, depriving them of a fair opportunity to win, they would not have purchased DFS entry slots.

9.      Defendants' conduct violates California's Unfair Competition Law, California's False Advertising Law, New York's Unfair Competition Law, and constitutes negligence and breach of contract.  Plaintiff and the proposed Class of DFS players (as further defined below) therefore seek monetary damages and injunctive relief, including a full refund of the entry fees they paid.

**II.     PARTIES**

10.     Plaintiff John McCallie is a resident of San Diego, California.  He has paid

approximately $2,000 on entry fees for DFS contests to both DraftKings and FanDuel between approximately October 2013 and the present.

11.     Defendant DraftKings, Inc. is a Delaware Corporation with corporate headquarters at 225 Franklin Street in Boston, Massachusetts.  DraftKings describes itself as a "leading skill-based Daily Fantasy Sports (DFS) gaming destination for fans in North America to compete in single-day online games for cash and prizes across the largest variety of professional and collegiate sports."  DraftKings maintains exclusive partnerships with Major League Baseball, the National Hockey League, Major League Soccer, NASCAR, and the Ultimate Fighting Championship.  Draft Kings reported $304 million in entry fees in 2014 and is valued at approximately $1.2 billion.  DraftKings has applied for and received licenses for "pool betting" and "gambling software" from the United Kingdom's Gambling Commission.

12.     FanDuel Inc. is a Delaware Corporation with corporate headquarters at 19 Union Square West, New York, New York.  FanDuel describes itself as the "leader in one day fantasy sports," and states that it "is the largest daily fantasy sports company, offering a multitude of one-day game options for NFL, NBA, MLB, NHL and college football and basketball."  Like DraftKings, FanDuel also says that it is "a game of skill," adding that it "received a specific exemption from the 2006 Unlawful Internet Gambling Enforcement Act (UIGEA)," meaning that "FanDuel is not illegal in any way."  FanDuel reported $621.7 million in player entry fees in 2014 and has a value of over $1 billion.

13.     Together, Defendants control 95 percent of the DFS market, which is increasingly lucrative.  According to a study of the DFS industry performed by Eilers Research, DFS contests will generate approximately $2.6 billion in entry fees in 2015 and grow 41 percent annually, reaching $14.4 billion in 2020.  According to The New York Times, the financial

stakes are so high that even NFL teams, who are "staunch opponents of sports betting" have partnered with Defendants.

## III.   JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because Plaintiff brings class claims on behalf of citizens of states different than Defendants' states of citizenship, the amount in controversy exceeds $5 million, and the proposed class includes more than 100 members.

15.   This Court has personal jurisdiction over FanDuel because FanDuel is headquartered in New York, New York, and conducts substantial business in this District.

16.   This Court has personal jurisdiction over DraftKings because DraftKings conducts substantial business in this District.

17.   Venue is proper in this District under 28 U.S.C. § 1391 because FanDuel resides in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here.

## IV.   FACTUAL ALLEGATIONS

### A.   Daily Fantasy Sports

18.   Traditional fantasy sports are contests where participants play the role of general manager and assemble teams of athletes through fantasy drafts. Rosters are composed of lineups of actual players of a professional sport. Fantasy contest participants generally use online platforms like yahoo.com and ESPN.com to host the drafts, calculate weekly points, and provide up-to-date team rankings. There are fantasy games offered across all the major sports (baseball, basketball, football and ice hockey).

19.   In traditional fantasy sports leagues, drafts are held prior to the real world

professional sports season.  In the drafts, each fantasy sports participant will select a number of

actual players from different real world teams, who will combine to form one fantasy team. On-

field performance by real-world athletes translates into fantasy points.  For example, if a wide

receiver catches a touchdown in an NFL game, that wide receiver might earn six fantasy points.

Using traditional fantasy football as an example, fantasy matchups are usually head-to-head, so

whichever fantasy roster totals the highest fantasy points in a given week will win that fantasy

matchup.  Teams are ranked by head-to-head fantasy record, and at the end of the year, there are

single elimination playoffs.  Whichever fantasy team prevails, wins the fantasy league.

Traditional fantasy sports therefore last close to an entire real world sports season.

20.     Because traditional fantasy sports leagues last close to an entire real world

professional sports season, fantasy players are rewarded for their skill and knowledge of real

world statistical information throughout the season.  Like real world general managers,

traditional fantasy players can add or release players, manage players by placing them on the

disabled or injured reserve lists, and complete trades with other fantasy competitors.  All of

these activities change the composition of a fantasy competitor's team and increase or diminish

his chance of winning.

21.     Unlike traditional fantasy sports which track player performance over an entire

season, DFS contests track player performance over a single game.  Using the NFL as an

example, in DFS, players are selected before their real world teams begin their games.  The real

world players' performance in a game is converted into fantasy points, and a DFS contest

winner is selected after all NFL games for a given week are completed.  As the Nevada Attorney

General put it, "although the owner selects lineups, once the lineup has been selected—at least

in the context of daily fantasy sports—the owners have basically no ability to control the

outcome of the simulated game."  Because DFS entrants cannot act as general managers to alter the composition of their teams over the course of a real world season, DFS entrants' skill and knowledge play a far lesser role in DFS than they do in traditional fantasy sports.

22.     DFS websites offer several types of contests that generally consist of either head-to-head contests or tournaments.  DFS entrants are charged entry fees for each contest they join which can range from 25 cents to $5,300.  In head-to-head contests, one owner competes against another owner.  Both pay entry fees and the owner with the highest total score after a given week's games end will win the pot, less a fee taken by the DFS operator known as a "rake."  Tournaments are contests involving more than two owners where all contestants pay an entry fee and compete against one another.

23.     There are several different types of tournaments based on how winners are paid out.  One of the largest and most well-known DFS contests is the DraftKings NFL Millionaire Maker, a top-X contest where first place collects $1 million.  The entry fee is $20.

24.     DFS is a rapidly growing multi-billion dollar industry.  Both Defendants collected hundreds of millions of dollars in entry fees in 2014 and are currently valued at over $1 billion each.  According to The New York Times, it is estimated that DFS companies will collect $2.6 billion in entry fees in 2015 and are projected to collect more than $14 billion in entry fees in 2020.

**B.     DFS Player Selection and the Importance of Inside Information**

25.     Traditional fantasy sports leagues generally employ either snake or auction drafts to pick players at the beginning of a fantasy season.  In a snake draft, owners take turns picking actual players for their fantasy teams.  In an auction draft, each owner is allotted a pool of money to use to bid for players.  Players then take turns bidding against one another for the

players.  In both snake and auction drafts different fantasy participants cannot own the same player.

26.     DFS entrants generally do not pick players via snake or auction drafts.  Instead, most DFS contests provide for salary-cap drafts.  Like auction drafts, salary-cap drafts allot each entrant a budget for bidding on players.  Unlike auction drafts, entrants do not bid against one another and different entrants can own the same real world players.  The goal is to select the best combination of real world players in a given week under the allotted salary cap.

27.     Each DFS website sets weekly individual athlete salaries based on proprietary valuation systems.  Generally, marquee, well-known athletes will have a higher fantasy salary than less well-known or second string players.  As a result, there is tremendous value in knowing which cheaper players are likely to perform well on a particular week because filling out a roster with cheaper players allows an entrant the flexibility to select expensive players who are likely to score well.  Likewise, there is great value to knowing which marquee players are likely to underperform due to performance or injury issues as entrants with this information will not waste money on those players.  As industry website Rotogrinders explained "The reason that the distribution of salaries matters so much is that you should be thinking of each pick not in terms of what you gain, but rather what you lose.  When you select a particular player, you lose a certain amount of cap space that could otherwise have been applied to other positions.  Thus, you want to search for large deviations in projected points that aren't reflected in salaries."

28.     In DraftKings' NFL Millionaire Maker contest for example, entrants are allotted a fixed salary cap of $50,000 that they can then use to draft a nine player roster.  The highest priced position players cost between $8,000 and $9,000.  Lower priced players can cost as little as $2,500.  Knowing which players are over or undervalued in a given week affords DFS

entrants a substantial advantage over others.

29.     Defendants' employees have access to internal tracking tools that catalog information like the most commonly selected players in a given week, which can inform their selection strategy.  DFS employees also know how Defendants set salaries internally and track the relevant factors.  Similarly, insiders like players, their spouses and family members, and real world team employees have access to non-public information that is germane to fantasy player value. A team physician or spouse may know that a particular player is suffering from a strained hamstring and is unlikely to perform as optimally as he otherwise would, which impacts value but may not be reflected in that player's assigned DFS salary.  Referees can directly impact player value by controlling the statistics players earn on the real world field of play.

30.     The non-public information available to insiders confers a substantial advantage in DFS contests.  Allowing insiders to compete alongside typical contestants renders DFS unfair.  According to the New York Times, playing DFS while in possession of inside information "is absolutely akin to insider trading . . . .  It gives that person a distinct edge in a contest.  . . . The single greatest threat to the daily fantasy sports industry is the misuse of insider information.  It could imperil this nascent industry unless real, immediate and meaningful safeguards are put in place."

### C.     DFS Constitutes Unregulated Gambling Activity, Not a Pure "Game of Skill"

31.     Both DraftKings and FanDuel falsely told consumers that they are games of skill in order to exploit what they perceived to be a loophole in the Unlawful Internet Gambling Enforcement Act ("UIGEA").  The UIGEA provides that fantasy sports are exempt from its prohibition on gambling if: (1) they are not dependent solely on the outcome of a single event or a single individual's performance; and, (2) the chances of winning are due to the skill and

relative knowledge of the participants.  The UIGEA carve out was targeted at traditional fantasy sports, not DFS, which was not yet prevalent when the UIGEA was passed. Nevertheless, in order to avoid being regulated as gambling, Defendants represented to consumers that their DFS contests are games of skill.  Examples of Defendants' nearly identical statements on their websites, including in their Terms of Use are as follows:

- **DraftKings.**  "Daily fantasy sports is a skill game and is not considered gambling."[2]  DraftKings clarifies "Contests offered on this website are contests of skill. . . . [W]inners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules."[3]

- **FanDuel.** "FanDuel is a game of skill. . . . [W]inners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most fantasy points."[4]

32.     Despite telling customers that DFS is a "game of skill," DraftKings's CEO, Jason Robin, has made statements and taken actions consistent with the reality that DFS constitutes gambling activity and needs regulation.  In July 2012, Jason Robins made several comments on Reddit.com, an online bulletin board system, where users and community members can comment.  Mr. Robin opened a thread with the introductory comment: "We quit our jobs to pursue a dream of starting a fantasy sports game company.  Last week we raised $1.4M to do it.

---

[2] DraftKings, 100% Legal, available at https://www.draftkings.com/help/why-is-it-legal (last visited October 22, 2015).
[3] DraftKings, Terms of Use (August 18, 2015), available at
https://web.archive.org/web/20151007115354/https://www.draftkings.com/help/terms (last visited October 22, 2015).
[4] FanDuel, Terms of Use (November 29, 2013), available at
http://web.archive.org/web/20130814150029/https://www.fanduel.com/terms (last visited October 21, 2015).

AMA [ask me anything]."  In responding to several posts, Mr. Robins stated that the concept for DraftKings is "almost identical to a casino.. [sic] specifically Poker.  We make money when people win pots."  He went on to explain that "Our concept is a mashup between poker and fantasy sports.  Basically, you pick a team, deposit your wager, and if your team wins, you get the pot."  He also explained that DraftKings was exploiting the game of skill loophole: "Fantasy sports has a carve out from the 2006 gambling regulation because it's considered a game of skill.  This concept where you can basically 'bet' your team will win is new and different from traditional leagues that last an entire season."  Similarly, DraftKings applied for and obtained licenses from the United Kingdom Gambling Authority for operating "Gambling Software" and "Pool Betting."

33.     Based on Mr. Robin and DraftKings's statements and actions, and after considering DFS industry mechanics, on October 16, 2015 the Nevada Attorney General issued a 17 page memorandum finding that DFS "constitute sports pools and gambling games" and suspended DFS operation in the state of Nevada until DFS operators obtain licensure and submit to regulation.  The Nevada Attorney General relied in part on the findings of Dr. Timothy Fong, Associate Clinical Professor of Psychiatry and Biobehavioral Sciences at the David Geffen School of Medicine at UCLA and Executive Director of the UCLA Gambling Studies Program:

> Very simply, it's gambling.  [it's putting] money on an event with a certain
> outcome in the hopes of winning more money.  To call it anything else is really
> just not accurate.  That link hasn't really been made by the players and the
> public—that what I'm doing is no different than playing blackjack or craps or
> betting on sports in Vegas casinos.

34.     The Nevada Attorney General also quotes former Representative Jim Leach, the congressman who drafted UIGEA about whether UIGEA legalizes DFS as Defendants assert.  According to Representative Leach "it is sheer chutzpah for a fantasy sports company to cite the

law as a legal basis for existing.  Quite precisely, UIGEA does not exempt fantasy sports companies from any other obligation to any other law.  There is no credible way fantasy sports betting can be described as not gambling . . . [o]nly a sophist can make such a claim."

35.     That DFS is gambling does not mean there is no skill element involved.  In Nevada for example, "game of skill" has been defined as "a game in which the skill of the player, rather than chance, is the dominant factor in affecting the outcome of the game as determined over a period of continuous play."  Accordingly, a contest can be gambling and contain elements of both skill and chance.  The fact that DFS occur in one day diminishes the impact of player skill and knowledge following lineup selection.  As the Nevada Attorney General concluded, DFS constitute gambling, and not games of pure skill, and must be regulated accordingly.

36.     Other states are starting to follow Nevada's lead.  California State Assembly Member Adam Gray introduced a bill to provide for the licensure and regulation of DFS in California on February 27, 2015.  The proposed bill's stated purpose is "[t]o better protect the people of California from potential risks from, and to maintain oversight of the systems used to carry out, Internet fantasy sports games . . . ."  After the Nevada Attorney General's findings were released, Assemblyman Gray stated that it further highlights the need for regulation: "Even church fundraisers for bingo night have some oversight.  With the amount of money we've seen and the amount of participation we've seen in California and across the country, we've got to have some regulation."  Officials in Pennsylvania, Illinois, Ohio, Delaware, and Georgia have voiced similar calls for regulation and oversight of DFS.

   D.     **Defendants' Advertisements**

37.     Leading up to the 2015 football season, Defendants launched an aggressive and

expensive advertising campaign.  The two companies are reported to have spent over $150

million combined on advertising between July and September 2015, and show no signs of

slowing down.  According to one report, DraftKings has promised to spend half a billion dollars

on advertisements with ESPN and Fox Sports over the next two years. According to a

September 15, 2015 Chicago Tribune article:

> "Blitz" seems like the perfect word to describe last weekend's pitiless
> onslaught of football-game commercials for daily fantasy sports betting sites.
> At nearly every break in the action, college or pro, viewers were hit with
> come-ons for DraftKings and FanDuel, the dominant companies offering the
> increasingly popular form of gambling in which a player can go online, pay an
> entry fee, pick a new fantasy team every day and compete against other
> players.

38.     Like their websites, Defendants' advertisements falsely characterize DFS as a

"game of skill" that affords typical entrants a fair opportunity to use their knowledge to win.

The advertisements do not disclose that DFS is unregulated gambling activity, nor do they

disclose that certain players have unfair advantages over others due to their access to non-public

information.  Examples of the types of representations made by Defendants in their

advertisements are as follows:

- **DraftKings.** In a recent commercial, DraftKings described itself as "a game
  within the game that requires a different set of skills . . . we don't just play, we
  are players, we train, and we win."  In another commercial DraftKings advertised
  "every week, use your knowledge and showcase your skills . . . you like football,
  you like winning."  DraftKings also emphasizes that entrants are afforded a fair
  chance to win money: "The giant check is no myth, no mirage, no fool's gold.
  It's our trophy.  And many hoist it playing our one-week games."

- **FanDuel.** In addition to portraying DFS as a game of skill on its website,

FanDuel's advertisements emphasized the ability of "regular guys" to win.  In a current advertisement, FanDuel features a contestant named "Chris," who states "I'm just a regular guy.  FanDuel has made it where anybody can play, anybody can succeed."  In another current testimonial format advertisement, an entrant named Vernon says "Nothing special about me.  The difference is I played and they didn't."  FanDuel also runs advertisements emphasizing that skill, and knowledge are the critical factors for success.  A current advertisement states "get paid for that knowledge" and "smarter than the average fan? Try a 50/50 league and win some cash."

### E.   Insider Misuse of Non-Public Information

39.   Because Defendants falsely represented that DFS is a game of skill, they have successfully avoided the tight regulation that normally accompanies gambling activities.  Up until October 7, 2015, Defendants did not have procedural safeguards in place to protect against insiders appropriating and using non-public information to gain an unfair advantage in DFS contests.  Over the last six weeks, however, several reports have surfaced pointing out that certain people have access to and have been using non-public information to enter and win DFS contests.

40.   On September 16, 2015 the website ThinkProgress.org reported that there are not sufficient rules in place to protect against athletes' families and other team employees like team doctors and trainers from capitalizing on inside information about injuries, playing time, or benchings that could provide an advantage to DFS players.  ThinkProgress reported that such insiders are "most likely free to use or sell this information."  Similarly, up until October 16, Defendants had no policy against referees or umpires participating in DFS, which has caused

substantial concern for the National Collegiate Athletic Association, which recently barred

Defendants from advertising during championship events, including television broadcasts and

has long prohibited sports wagering by its athletes, including DFS.

41.    On October 5, 2015, the New York Times reported that Ethan Haskell, an

employee at DraftKings, admitted to inadvertently releasing inside information before the start

of the third week of N.F.L. games.  The information at issue showed which players were most

often used across all lineups submitted to DraftKings' N.F.L. Millionaire Maker contest.  That

same week, Mr. Haskell won $350,000 by entering a competition at FanDuel.  Haskell's recent

success in DFS follows a very successful string of daily fantasy baseball entries.  On August 1,

2015, Haskell finished first of 1,810 teams in a FanDuel pool titled "40K Sat MLB Grand Slam

(Early Only)."  He had three first place finishes in August and had a total of eight top 10

finishes.  He took home a cash prize on 20 of the 31 days in August.

42.    Since news of Haskell's story broke, several accounts of DFS employees playing

on rival websites have surfaced.  FanDuel has confirmed that Matthew Boccio, a FanDuel

employee, has entered contests on DraftKings.  Chris Grove, editor of legalsportsreport.com said

that "[t]here's a significant amount of crossover" and that in hiring, Defendants "relied heavily

on the player population."  DraftKings similarly acknowledged that employees of both

DraftKings and FanDuel "won big jackpots playing at other daily fantasy sites."  Defendants

conceded there were no policies in place prohibiting employees from playing DFS on rival

websites when their employees played and won.

43.    The New York Times reported on October 11, 2015 that, during a private

DraftKings party, Madison Calvert, a typical DFS entrant, was discussing his choice of pitcher

in a baseball contest with DraftKings executive Jon Aguiar when Aguiar "suddenly made a

quick check on his phone and, to Calvert's surprise, informed him that his pick of a pitcher was a poor choice because many other players had selected him.  'I shouldn't have pulled that up in front of you, ha-ha,' Calvert said Aguiar told him."  That same day, Calvert noticed that he had been challenged in a head-to-head competition by Rick Sawyer, who he verified was a business planning manager at DraftKings.

44.     Leonard Don Diego, who first worked at FanDuel but now works at DraftKings has also been accused of sharing lineups.  Justine Sacco, a spokeswoman for FanDuel, told the New York Times that DraftKings employees had won up to $10 million in FanDuel contests.

45.     Because FanDuel and DraftKings employees set player prices and control the algorithms that dictate scoring, they have significant advantages over normal DFS players.  According to Cory Albertson, a well-known DFS entrant, "When there are no internal controls to keep your employees in check in terms of what they're doing, it's understandable that many of them would become preoccupied with trying to also just win money playing fantasy sports."

46.     On October 7, 2015, in response to reports about Haskell and other employees misusing inside information, Defendants announced in a statement that they had permanently banned their employees from playing on other fantasy websites.

47.     On October 16, 2015, FanDuel released revised Terms of Use, including a rewritten "eligibility" section that prohibits: (1) employees of DFS websites from entering its contests; and, (2) "[a]thletes, coaches, and other team management, team support personnel . . . and team owners, referees, league employees, sports commissioners and other individuals who through an ownership interest or game-related employment can influence the gameplay" from

entering its contests.[5]

48.     DraftKings similarly revised its Terms of Use on October 19, adding to its "conditions of participation" section that the following classes of persons are prohibited from entering a DFS contest: (1) DraftKings employees and their immediate family members; (2) employees of other DFS websites and their immediate family members; (3) anyone with access to "any pre-release, confidential information or other information that is not available to all other entrants of a Contest and that provides the entrant an advantage in such a Contest; and, (4) employees of sports leagues that are prohibited by the leagues from entering DFS contests.[6]

49.     On October 17, 2015, DraftKings released a two page statement disclosing that it retained the law firm Greenberg Traurig, LLP to conduct an independent investigation into Ethen Haskell's use of inside information in the FanDuel contest where he won $350,000. Greenberg Traurig concluded that Haskell did not misuse the information.  The statement solely addresses the $350,000 contest, but provides no detail on Haskell's use of inside information during his string of daily fantasy baseball successes and does not address whether or not any of the other DraftKings employees that were permitted to and did play DFS misused inside information to gain an unfair advantage in doing so.

50.     Accordingly, typical DFS entrants were not afforded a level playing field that allows individuals to fairly capitalize on their knowledge to prevail in DFS contests because individuals with competitively advantageous non-public information were allowed to enter DFS contests until October 2015.  Athletes and their families, team physicians, trainers, coaches and owners and their families, and DFS employees were allowed to enter DFS contests until very

_____

[5] FanDuel, Terms of Use (October 16, 2015), available at https://www.fanduel.com/terms (last visited October 22, 2015).
[6] DraftKings, Terms of Use (October 19, 2015), available at https://www.draftkings.com/help/terms (last visited October 22, 2015).

recently.  As a result, Defendants allowed a subgroup of DFS entrants possessing important

information like (1) player injury status; (2) player disciplinary status; (3) intended play calling;

(4) salary setting information; (5) most likely low priced players to perform well; and, (6) most

commonly selected DFS players in a given week, to compete alongside average DFS entrants.

Normal DFS entrants like Plaintiff and Class members were therefore deprived of the fair

opportunity to leverage their skill and knowledge to win that Defendants promised they would

receive.

      51.    Defendants' failure to bar those possessing inside information from participating

in DFS contests has led to unfair contests where typical contestants have a very slim chance of

winning anything.  Even before the recent reports of insiders misusing information surfaced,

McKinsey & Co.'s Global Sports & Gaming Practice conducted a study of the pool of DFS

winners during the first half of 2015's Major League Baseball season and concluded that just 1.3

percent of DFS entrants won 91 percent of the profits.

      **F.**     **<u>Reactions to the DFS Scandal</u>**

      52.    Defendants' professional sports league partners, state and federal regulators,

elected officials, and others have reacted to news that DFS employees and other insiders were

permitted to compete against normal DFS contestants by calling for strict regulation of DFS.

      53.    Major League Baseball is an exclusive partner of and investor in DraftKings.

On October 6, 2015, MLB released a statement reacting to Defendants' failure to prohibit their

employees from entering DFS contents: "Major League Baseball has a policy that prohibits

players and employees from participating in fantasy baseball games in which prize money or

other things of value are available to participants.  We were surprised to learn that DraftKings

allowed its employees to participate in daily fantasy games.  We have reached out and discussed

this matter with them."

54.     On October 20, 2015, the National Collegiate Athletic Association sent
Defendants a letter barring them from advertising during championship events, including
television broadcasts.  The letter also asks Defendants to notify the NCAA if any referees or
officials have participated in DFS.  The NCAA opposes DFS contests based on college sports
because it considers them gambling.  The October 20, 2015 letter followed an earlier letter to
Defendants that requested that Defendants cease offering DFS contests based on college
athletics "because they were inconsistent with our values, by-laws, rules and interpretations
regarding sports wagering as well as possibly a violation of UIEGA [Unlawful Internet
Gambling Enforcement Act of 2006], PASPA [Professional and Amateur Sports Protection Act
of 1992], and various state laws."  The NCAA's letter advised Defendants that the NCAA was
now "informing referees and others who officiated at championships that they were prohibited
from participating in paid fantasy games" and also referenced the fact that Defendants "had
agreed to confirm whether any members of a list of referees or game officials that the NCAA
planned to provide had participated in their contests."

55.     The National Basketball Association is in a multi-year partnership with and is an
equity holder of FanDuel. On October 21, NBA commissioner Adam Silver issued a statement
expressing "nervousness" about the reports of DFS insiders entering DFS contests.  He stated
"There should be a regulatory framework; there should be increased transparency for consumers
. . . .  I think it would ultimately aid the industry.  In fact, I think we're seeing the marketplace
impacted, because there's not a clear regulatory framework right now."

56.     Congressman Frank Pallone, the U.S. Representative for New Jersey's 6th
Congressional District, observed "Daily fantasy sports is an industry crying for consumer

protection," and "It's unregulated.  It's like the Wild West."  Congressman Pallone explained,

"Despite its explosion in popularity and the allegation of 'insider trading' by employees of daily

fantasy sports operators, the industry is operating in a void within the legal structure—without

any regulation or the necessary transparency."  Congressman Pallone has called for a hearing on

the legality of DFS and asked Defendants to produce information on how they monitor

participants and whether there is proof that real world players and officials are in compliance

with league policies prohibiting them from playing.

57.    The NFL is the only major sports league in the United States that has not barred

its athletes from participating in DFS contests.  Accordingly, on October 22, 2015, Congressman

Pallone sent Defendants' letters asking for the identities of NFL players, referees and other

game officials including replay officials, coaches, trainers, other medical staff, and team

management, including owners, that have entered their DFS contests over the last year.

58.    Congress will hold hearings to examine the integrity and legality of DFS in

November.  In relation to the announcement of the congressional hearings, Senator Robert

Menendez stated: "No one envisioned a multibillion dollar industry, daily games, hundreds of

thousands of people playing, billions of dollars at stake.  And look, at the end of the day, we

have poker, horse racing—you can get better at skills by practicing and studying up, but they're

regulated as gambling."  Congressman Hakeem Jeffries, the U.S. Representative for New York's

8th District similarly stated, "It's time to determine whether permitting a multi-billion dollar

industry to police itself serves the best interests of the American people."  Harry Reid, a United

States Senator for Nevada and former chairman of the Nevada Gaming Commission, called

Defendants' conduct "absolutely scandalous," and opined that news that Defendants' employees

were allowed to enter DFS contests "should also be a warning shot to everybody that online

gaming is a real scary thing and we'd better look at all of it."

59.     The New York Attorney General issued letters to both DraftKings and FanDuel, stating: "The integrity of [Defendants] and [their] policies and practices are matters of concern to the public, particularly to the many customers who put money at risk on your site[s] each day."  The New York Attorney General sought documents and information relating to the following categories, among other things: (1) the employees responsible for aggregating statistics, setting athlete's salaries, coding athlete salary setting algorithms, tracking percentage of ownership for particular athletes, and tracking DFS entrant data like win/loss record; (2) details about the storage of the data in category one, where it is stored, who has access, and the nature of policies in place to ensure unauthorized employees do not have access; and, (3) copies of employee policies and procedures including relating to data usage and proper use of company information and participation in DFS.

60.     Nine other states have announced that they are investigating shutting down or regulating DFS in some way.  Massachusetts Attorney General Maura Healey said "This is an issue that cries out for a regulatory legal framework and structure that will match the modern reality of what is happening here."

61.     The United States Department of Justice has also announced an investigation into Defendants and has since issued subpoenas to DraftKings and the Fantasy Sports Trade Association, the main trade association for the fantasy sports industry.  According to the United States Attorney's office, the DOJ is investigating whether the DFS business model violates federal law.

V.     **PLAINTIFF'S PURCHASES**

62.     Mr. McCallie has participated in DFS contests provided by  FanDuel for

approximately two years.  He also began to participate in DFS contests with DraftKings beginning in 2015.

63.     Before entering Defendants' DFS competitions, Mr. McCallie encountered Defendants' representations that DFS contests are games of skill and that all participants had a fair opportunity to leverage their skill and knowledge to win DFS contests.  Mr. McCallie thus reasonably believed at the point of sale that the DFS contests he entered would be fair.

64.     Had Mr. McCallie known that Defendants did not prohibit insiders with competitively advantageous, non-public information to participate in their DFS contests he would not have purchased entry slots in those DFS contests.

## VI.     CLASS ACTION ALLEGATIONS

65.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and a proposed nationwide class ("Class") initially defined as:

> All persons residing in the United States who purchased entry slots in DFS contests provided by DraftKings or FanDuel before October 6, 2015 where other entries in those contests were made by individuals possessing competitively advantageous non-public information.

66.     Excluded from the proposed Class are: (1) Defendants' officers, directors, employees and their immediate families; (2) the officers, directors, and employees of other DFS businesses; (3) DFS entrants who received competitively advantageous non-public information not available to all other entrants of a DFS contest; and, (4) any judicial officer assigned to this case.

67.     This action has been brought and may properly be maintained as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(1), and 23(b)(3).

68.     Numerosity—Fed. R. Civ. P. 23(a)(1).  The members of the Class are so numerous that joinder of all numbers is impracticable.  DraftKings reported $304 million and

FanDuel reported approximately $620 million in entry fees in 2014.  The Class conservatively consists of tens of thousands of geographically dispersed DFS entrants, making joinder impracticable.

69.     Existence and predominance of common questions of law—Fed. R. Civ. P. 23(a)(2), 23(b)(3).  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the many questions of law and fact common to the Class are:

- Whether DFS contests are a game of skill or constitute gambling;

- Whether DFS entrants had a fair opportunity to win DFS contests;

- Whether Defendants had in place sufficient safeguards to block those possessing competitively advantageous non-public information from participating in their DFS contests;

- Whether Defendants' representations to the public about their DFS contests were false or deceptive;

- Whether Defendants knew, or in the exercise of reasonable diligence should have known, that their representations regarding their DFS contests were false or deceptive;

- Whether Defendants' representations about their DFS contests would deceive a reasonable consumer and constitute unfair, deceptive, untrue, or misleading advertising;

- Whether Defendants' conduct violated the California Unfair Competition Law, the California False Advertising Law, and the New York Unfair Competition Law;

- Whether Defendants acted negligently in categorizing their DFS contests as fair game of skill;

- Whether, by failing to provide a fair game of skill to Plaintiff and Class members, Defendants are liable for breach of contract; and

- Whether Defendants' Terms of Use are valid.

70.     Typicality—Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the members of the Class.  Among other things, Plaintiff and Class members purchased entry slots in DFS competitions provided by Defendants and have been harmed by Defendants' unlawful activities.

71.     Adequacy—Fed. R. Civ. P. 23(a)(4).  Plaintiff will adequately represent the proposed Class members.  He has retained counsel competent and experienced in class action and consumer protection litigation and intends to pursue this action vigorously.  Plaintiff has no interests contrary to or in conflict with the interests of other Class members.

72.     Superiority—Fed. R. Civ. P. 23(b)(3).  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

73.     In the alternative, the Class may be certified under Rule 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants.

## FIRST CAUSE OF ACTION
### (For Unlawful, Unfair, and Fraudulent Business Practices under California Business & Professions Code §§ 17200, et seq.)

74.     Plaintiff, on behalf of himself and the Class, realleges as if fully set forth, each and every allegation set forth above.

75.     Defendants' acts and practices, as alleged in this complaint, constitute unlawful, unfair and/or fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200, et seq.

76.     Defendants violated the Unfair Competition Law by falsely representing that its DFS contests are "games of skill", by falsely representing to contestants they had a fair opportunity to use their skill and knowledge to win DFS contests, and by failing to disclose that they permitted individuals with competitively advantageous non-public information to unfairly compete in DFS contests with contestants who did not possess insider information like Plaintiff and Class members.

77.     Defendants engaged in unlawful practices by violating

78.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.  By falsely describing their DFS contests as fair games of skill and failing to advise consumers that individuals with competitively advantageous non-public information were allowed to participate, Defendants made untrue or misleading statements that they knew or by the exercise of reasonable care should have known were untrue or misleading in violation of California's False Advertising Law.

79.     Defendants also engaged in unlawful practices by violating the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. §§ 5361, et seq., which prohibits "person[s] engaged in the business of betting or wagering"  from knowingly accepting credit or money

from other persons in connection with "unlawful internet gambling." Because DFS is gambling, and not a "game of skill," Defendants violated the UIGEA by accepting Plaintiff and Class members' DFS entry fees.

80.     Because Defendants' DFS contests contain an element of chance and provide cash prizes to contestants who pay entry fees, Defendants' practices are additionally unlawful under California Penal Code Section 319, which prohibits "any scheme for the disposal or distribution or property by chance, among persons who have paid or promised to pay any valuable consideration of the chance of obtaining such property or a portion of it . . . upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance . . . ."

81.     Defendants engaged in unfair business practices by, among other things: (1) engaging in conduct where the utility of that conduct is outweighed by the gravity of the consequences to Plaintiff and Class members; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and Class members; and, (3) failing to protect consumers from unfair or deceptive business practices.

82.     Defendants engaged in fraudulent business practices by engaging in conduct that was and is likely to deceive a reasonable consumer.

83.     As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices as alleged above, Plaintiff and Class members have suffered injury in fact and lost money or property, because they purchased entry slots in Defendants' DFS contests that they otherwise would not have because the contests are not fair and are polluted by entrants possessing competitively advantageous non-public information. Meanwhile, Defendants have generated more revenue than they otherwise would have but for their misrepresentations,

unjustly enriching themselves.

84.     Plaintiff and Class members seek equitable relief, including restitutionary disgorgement of all profits accruing to Defendants because of their unlawful, unfair, fraudulent, and deceptive practices; attorneys' fees and costs; declaratory relief; and a permanent injunction enjoining Defendants from their unlawful, unfair, fraudulent, and deceitful activity.

**SECOND CAUSE OF ACTION**
**(For False Advertising Under California Business and Professions Code §§ 17500, et seq.)**

85.     Plaintiff, on behalf of himself and the Class, realleges as if fully set forth, each and every allegation set forth above.

86.     Defendants' acts and practices, as alleged in this complaint, constitute untrue and misleading statements, issued in violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq.

87.     Defendants violated California's False Advertising Law by: (1) representing that their DFS contests are games of skill that afford normal contestants a fair opportunity to use their skill and knowledge to win; and, (2) failing to apprise their customers that there were no prohibitions in place to protect against individuals with competitively advantageous non-public information competing in their DFS contests.

88.     Defendants' false advertising, misrepresentations, and material omissions were and are likely to deceive reasonable consumers.

89.     As a direct and proximate result of Defendants' false advertising, Plaintiff and Class members have suffered injury in fact and lost money or property, in that they purchased entry slots in Defendants' DFS contests when they otherwise would not have.  Meanwhile, Defendants have sold more entry slots than they otherwise would have, unjustly enriching themselves.

90.     Plaintiff and Class members seek equitable relief, including restitution of all amounts paid for Defendants' DFS entry slots, restitutionary disgorgement of all profits accruing to Defendants because of their unfair and fraudulent practices, attorneys' fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unfair and fraudulent activity.

### THIRD CAUSE OF ACTION
**(For Deceptive Acts and Practices in Violation of N.Y. Gen. Bus. Law § 349)**

91.     Plaintiff, on behalf of himself and the Class, realleges as if fully set forth, each and every allegation set forth above.

92.     Defendants falsely characterized their DFS contests as fair games of skill when in fact they constitute gambling and the contests were not fair because those with competitively advantageous non-public information were allowed to participate.  Defendants' representations and omissions complained of in this complaint were and are likely to mislead reasonable consumers acting reasonably under the circumstances.

93.     Defendants' acts and omissions thus constitute deceptive trade practices within the meaning of N.Y. Gen. Bus. Law § 349(a).

94.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff and Class members have been harmed.

95.     Plaintiff and Class members seek damages and equitable relief to prevent further wrongful conduct by Defendants.

### FOURTH CAUSE OF ACTION
**(Negligence)**

96.     Plaintiff, on behalf of himself and the Class, realleges as if fully set forth, each and every allegation set forth herein.

97.     Defendants owed Plaintiff and Class members a duty to accurately describe the nature and quality of their DFS contests, including whether or not their DFS contests are games of skill that afford all participants an equal opportunity to leverage their skill and knowledge to win.

98.     Defendants owed Plaintiff and Class members a duty to advise them that they had no prohibition against entrants in possession of competitively advantageous non-public information from competing in the same competitions as normal DFS contestants.

99.     Defendants owed a duty to Plaintiff and Class members not to engage in fraudulent or deceptive conduct, including the omission of information like their lack of sufficient safeguards to ensure procedural fairness in their DFS contests.

100.    A finding that Defendants owed a duty to Plaintiff and Class members would not impose a significant burden.  Defendants have the means to accurately apprise the public of the nature and quality of their DFS competitions, including whether certain participants are at an inherently advantageous position due to possession of non-public information.  Alternatively, Defendants have the means to prohibit and enforce the bar against DFS entrants in possession of competitively advantageous non-public information entering their DFS contests.  Both Defendants have supplemented their Terms of Use to enact such prohibitions in the weeks since news of insiders entering their DFS contests broke.

101.    By representing that their DFS competitions were fair games of skill, Defendants departed from the reasonable standard of care and breached their duties to Plaintiff and other purchasers of DFS entry slots.

102.    As a direct, reasonably foreseeable, and proximate result of Defendants' failure to exercise reasonable care and accurately describe the nature of their DFS contests, Plaintiff

and Class members have suffered damages because they spent more money on DFS contests than they otherwise would have.

103.    Plaintiff and Class members could not have prevented their damages through the exercise of reasonable diligence and neither Plaintiff nor members of the Class contributed to Defendants' breaches of their duties.

104.    Plaintiff and Class members seek to recover damages caused by Defendants and to enjoin their future wrongful conduct.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract)**

105.    Plaintiff, on behalf of himself and the Class, realleges as if fully set forth, each and every allegation set forth herein.

106.    Defendants entered into contracts with their customers.  Defendants accepted their customers' payments for entry slots, and, in return, promised to provide them with DFS contests that were games of skill that afforded Plaintiff and Class members a fair opportunity to use their skill and knowledge to win.

107.    Defendants breached its customer contracts because DFS contests are unregulated gambling activity, not a game of skill, and because not all players have a fair opportunity to use their skill and knowledge to win.  Some entrants have access to competitively advantageous non-public information and therefore have an inherently better chance at winning than normal entrants.

**JURY DEMAND**

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a.      For an order certifying the Class and appointing Plaintiff and his counsel to represent the Class;

b.      For an order awarding Plaintiff and Class members monetary damages;

c.      For an order awarding Plaintiff and Class members restitution, disgorgement, or other equitable relief as the Court deems proper;

d.      For an order enjoining Defendants from continuing to engage in unlawful business practices as alleged herein and ordering Defendants to engage in corrective action;

e.      For an order awarding Plaintiff and Class members pre-judgment and post-judgment interest;

f.      For an order awarding Plaintiff and Class members reasonable attorneys' fees and costs of suit, including expert witness fees; and,

g.      For an order awarding such other and further relief that this Court may deem just and proper.

Dated:   October 27, 2015                          Respectfully Submitted,


                                                   By:   _/s/ Amanda M. Steiner_____

                                                   Amanda M. Steiner
                                                   **GIRARD GIBBS LLP**
                                                   711 Third Ave., 20th Floor
                                                   New York, New York 10017
                                                   Telephone: (212) 867-1721
                                                   Facsimile:  (212) 867-1767
                                                   Email: as@girardgibbs.com

                                                   -and-

Daniel C. Girard (*Pro Hac Vice Pending*)
Eric H. Gibbs (*Pro Hac Vice Pending*)
Adam E. Polk (*Pro Hac Vice Pending*)
Steve A. Lopez (*Pro Hac Vice Pending*)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
Email: dcg@girardgibbs.com
Email: ehg@girardgibbs.com
Email: aep@girardgibbs.com
Email: sal@girardgibbs.com

*Attorneys for Plaintiff*